J-S46003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  S.C.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 473 EDA 2019 |

Appeal from the Decree Entered January 18, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000615-2018,
FID# 51-FN-001560-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: S.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 474 EDA 2019 |

Appeal from the Order Entered January 18, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0001452-2016,
FID# 51-FN-001560-2016

IN THE INTEREST OF:  A.R.U., A MINOR

APPEAL OF: T.C., MOTHER

:  IN THE SUPERIOR COURT OF
:          PENNSYLVANIA
:
:
:
:
:
:
:
:
:
:  No. 478 EDA 2019

Appeal from the Decree Entered January 18, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000616-2018,
FID# 51-FN-001560-2016

IN THE INTEREST OF:  A.U., A MINOR

APPEAL OF: T.C., MOTHER

:  IN THE SUPERIOR COURT OF
:          PENNSYLVANIA
:
:
:
:
:
:
:
:
:
:  No. 479 EDA 2019

Appeal from the Order Entered January 18, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-0001453-2016,
FID# 51-FN-001560-2016

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:                **FILED OCTOBER 22, 2019**

T.C. ("Mother") appeals from the decrees entered January 18, 2019, that granted the petition of the Philadelphia County Department of Human Services ("DHS"), and involuntarily terminated her parental rights to her sons,

_____

[*] Retired Senior Judge assigned to the Superior Court.

S.C.U. (born May 2008) and A.R.U. (born August 2013) ("Children").[1] Mother also appeals from the orders entered January 18, 2019, that changed Children's permanent placement goals from return to parent to adoption.[2] After careful review, we affirm.

The trial court set forth the following factual and procedural history of this case:

> On June 6, 201[6], [DHS] received [a] Child Protective Services ("CPS") report alleging that Children's sister, J.U., was raped by her stepfather [D.G.]. On June 7, 2016, [D.G.] was arrested and charged with rape by forcible compulsion, involuntary deviate sexual intercourse ("IDSI"), unlawful contact with a minor, aggravated indecent assault, sexual assault of a child and endangering the welfare of [a] child. [D.G.] was incarcerated at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia County.
>
> After [D.G.]'s arrest, Mother refused to cooperate with DHS and with J.U.'s Child Advocate. Mother did not respond to telephone calls and/or provide access to [J.U.] On July 13, 2016, DHS received a General Protective Services ("GPS") report that Mother was interfering with the criminal investigation by refusing to allow J.U. to testify against [D.G.] and that Mother planned to reside with [D.G.] if he was released from prison. Ultimately, Mother was

---

[1] By decree on the same day, the court terminated the parental rights of F.C.U. (Father) and an unknown putative father. Father has not separately appealed, nor is he a party to the instant appeal; the unknown putative father has not appealed, nor is he a party to the instant appeal.

[2] Although Mother filed notices of appeal on the dependency dockets for each child, she did not challenge the goal change in either her Pa.R.A.P. 1925(b) statement of errors complained of on appeal or in her brief. Accordingly, Mother has waived her challenges to the goal change. *See Krebs v. United Ref. Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

arrested pursuant to a bench warrant issued against her in connection to Mother's interference with the investigation. When Mother was arrested, police discovered correspondence between Mother and [D.G.] and evidence that she had bought one of the children to visit [D.G.] in prison. Thereafter, DHS obtained an Order for Protective Custody ("OPC") and placed [Children] in foster care through the Jewish Family and Children Services ("JFCS"). On July 25, 2016, [Children] were adjudicated dependent. In addition to this adjudication, the [c]ourt instructed Mother per court order not to discuss the ongoing criminal matter involving [D.G. and J.U.] with any of her [c]hildren. Furthermore, the [c]ourt ordered Mother to be permitted supervised visitation.

On September 27, 2016, after a full hearing, the court found clear and convincing evidence that visitation between Mother and Children was to remain suspended because sufficient evidence had been presented as to Mother's persistent violations of court orders. The [c]ourt found that Mother posed a grave threat to the Children during and after visitation. Mother had violated prior court orders to not visit the Children without supervision. The [c]ourt found that Mother continued to send text messages to [J.U.] and continued to interfere with the criminal investigation of [D.G.] despite court orders to cause no such interference. The [c]ourt also found that Mother had met the Children in secret without supervision and that Mother had encouraged the Children to lie to their foster parents and therapists. Mother appealed the [c]ourt's decision to suspend visitation. *See In Interest of A.U.*, [170 A.3d 1199 (Pa. Super. 2017) (unpublished memorandum)].

On May 3, 2018, the Community Umbrella Agency ("CUA") provided revised Single Case Plan ("SCP") objectives for Mother. These objectives were for Mother (1) to comply with all [c]ourt orders including but not limited to those orders in reference to visitation and the participation in CUA services; (2) to participate in mental health treatment and (3) to participate in domestic violence counseling.

The underlying Petition to Terminate Mother's Parental Rights to Children was filed on July 30, 2018, after Mother failed to meet her SCP objectives. Specifically, Mother failed to participate in abuse counseling and mental health treatment and continued to maintain contact with [D.G.]

*See* Trial Court Opinion, 5/2/19, at 2-4 (internal citations to the record omitted).

The trial court conducted hearings on DHS's petitions on November 30, 2018 and January 11, 2019. DHS presented the testimony of Danielle Johnson-Kennedy, CUA case manager; Andre McKnight, DHS social work supervisor; forensic and clinical psychologist William Russell, Ph.D.; K.J., foster father; Detective Linda Blowes; and Dana Walker, CUA case aide. Mother testified on her own behalf and presented the testimony of Dr. Arundathi Jayatilleke, Mother's rheumatologist; T.C., Mother's father; and Yolanda West, Mother's therapist.

Johnson-Kennedy testified that she is the current CUA case manager. *See* N.T., 11/30/18, at 9. At the time of the November hearing, Mother's objectives were to maintain no contact with J.U., comply with all court orders, engage in mental health treatment and continue visitation, and follow all recommendations from the parenting capacity evaluation. *Id.* at 11-12.

Mother's oldest son, H.U., began having behavioral issues in the foster home following the resumption of supervised visits. *Id.* at 17. Additionally, it appeared Mother was engaging in unauthorized contact with H.U. because H.U. was found in possession of gifts and extra money that foster father, K.J., had not given him. *Id.* at 20. Children were safe in their foster home and their needs were being met. *See* N.T., 1/11/19, at 5-6.

McKnight testified that the children came into the custody of DHS after J.U. had been sexually abused by D.G. and Mother was not letting J.U. testify

against D.G. *See* N.T., 11/30/18, at 39-40, 50-52. D.G. was later convicted of rape and other related crimes. *Id.* at 50.

McKnight further testified that Children are bonded to their foster father and look up to him. *Id.* at 47-48. A.R.U. calls foster father "dad." *Id.* at 174. Foster father meets all of Children's needs and they are excelling in the home. *Id.* at 175-78. Additionally, A.R.U., who was previously nonverbal, is speaking. *Id.* at 176.

McKnight did not believe that irreparable harm would result to Children if the parental bond was broken and that it was in Children's best interests to change their goal to adoption. *Id.* at 177. He did believe Children would suffer harm if their bond to foster father was broken. *Id.* at 178.

McKnight testified that single case plan objectives were established for Mother including not to have third party contact with Children and receive mental health counseling. *Id.* at 144-45. However, Mother violated the court order regarding contact, and Mother's therapist did not provide treatment records. *Id.* at 146-48.

With regard to the stay-away orders, McKnight personally observed Mother and J.U. together at the grocery store and told Mother she could not be in contact with J.U. *Id.* at 153-54. Mother violated the stay-away order on multiple other occasions, but when confronted, placed the blame on other people. *Id.* at 149-157.

There were also incidents where Mother gave Children inappropriate gifts including phones to S.C.U. and A.R.U. and a stun gun intended for J.U.

*Id.* at 157-60, 178-80, 186. Mother sent Children text messages through the phones despite the existence of a stay-away order. *Id.* at 157-60. At that time, S.C.U. was being disrespectful to his foster parent, and Children admitted in letters written to McKnight that Mother had told him to disrespect his foster parent. *Id.* at 185, 200-01.

McKnight testified that Mother's visits were suspended from September 2016 through August 2018. *Id.* at 208. With all of the factors above, McKnight felt there was no healthy parental bond between Mother and Children. *Id.* McKnight stated he had spoken with S.C.U., and S.C.U. wanted to stay with his foster father. *Id.* at 211-12. McKnight was removed from the matter due to false sexual abuse accusations brought by Mother. *Id.* at 170.

William Russell, Ph.D., performed a parental capacity evaluation of Mother and prepared a report in December 2017. *See* N.T., 11/30/18, at 59-60. He recommended Mother attend individual mental health therapy for major depressive disorder and follow court orders. *Id.* at 65, 75-76.

Dr. Russell noted Mother's traumatic history, including physical abuse, domestic violence, and a stroke. *Id.* at 66. As a result, Mother has a childlike, immature way of coping with stress, and her level of functioning leads her to make parenting decisions based on judgments that do not consider all of the information. *Id.* at 66-67. Mother showed little insight into her own medical conditions and situation and her children's needs, nor could she identify a support system. *Id.* at 69-70. Mother had been engaged in therapy but was no longer compliant with that recommendation. *Id.* at 81.

At the time he prepared the report, Dr. Russell did not feel that Mother was capable of providing safety and permanency to Children. *Id.* at 59-60. Additionally, Dr. Russell did not believe that Mother should be allowed to have unsupervised contact with Children. *Id.* at 77.

K.J., Children's foster father, testified that S.C.U. had been placed with him for a year and several months, and A.R.U. for a year. *See* N.T., 11/30/18, at 105. In August 2018, K.J. discovered that S.C.U. had a cell phone in his possession that K.J. had not given him. *Id.* at 108-109. S.C.U. admitted Mother had given him the phone, and that Mother was texting with him. *Id.* at 109-11.

K.J. testified that Children are doing well in his home and are a joy to have; S.C.U. calls K.J. "Uncle K." and A.R.U. calls K.J. "dad." *Id.* at 113. K.J. described his strong bond with Children. *Id.* at 120-21.

Detective Blowes testified that she was involved in the investigation regarding a third party report that McKnight had a sexual attraction to J.U. *See* N.T., 11/30/18, at 214-15. J.U. denied making the allegations and, following an investigation, Detective Blowes concluded that the accusations were unfounded. *Id.* at 215-218. Specifically, J.U. stated that Mother "made it up." *Id.* at 218. Detective Blowes had previously been involved in investigations involving the family when J.U. made allegations against her stepfather, D.G. *Id.* at 217-22.

Dana Walker testified that she is the CUA case aide serving as a visitation coordinator for Mother and Children. *See* N.T., 11/30/18, at 239-

40. Visitation has been occurring since August 2018, and is biweekly on Wednesdays. *Id.* at 240. Mother has not missed any visits. *Id.* Mother brings gifts to the visits and after giving the gifts, S.C.U. chooses to play with the gifts on his own rather than interacting with Mother, unless instructed to by his older brother, H.U. *Id.* at 241. A.R.U. does not interact with Mother either and prefers to play with gifts or coloring books and crayons unless instructed otherwise. *Id.* at 242.

Walker testified that she did not believe Children would suffer from irreparable harm if the relationship was severed because she did not observe a bond between Mother and Children. *Id.* at 243-44. She has asked S.C.U. if he would like to go home to Mother and he hunched his shoulders "like, 'I don't know.'" *Id.* at 249. Walker did not ask A.R.U. his preferences because he was only five years old. *Id.* at 250.

Dr. Jayatilleke, a rheumatologist, testified that Mother has systemic lupus and Sjogren's syndrome, both managed by oral medication. *See* N.T., 11/30/18, at 125. In the past, Mother suffered from a stroke that rendered her mute, but she can communicate via writing or a computer. *Id.* at 125. Dr. Jayatilleke testified that in her opinion, Mother's physical conditions would not affect her ability to care for Children but that she could not form an opinion on Mother's mental capacity to parent. *Id.* at 128-29, 133-36.

T.C., Mother's father and Children's maternal grandfather, testified that he is available to serve as additional support for Mother in the event Children are reunited with her. *See* N.T., 11/30/18, at 255-56. T.C. testified that there

are twenty or thirty other members of the family available to offer support, including his sisters and brothers. *Id.* at 256. T.C. testified he is involved in all of his twenty-nine grandchildren's lives as much as he is able. *Id.* at 257. T.C. lives four miles from Mother. *Id.* at 259.

T.C. observed Mother interacting with Children and testified that they loved each other. *Id.* at 260. T.C. stated that Mother did not have issues caring for Children or providing for their needs, however, the last time he saw Mother interacting with Children was "a couple years ago." *Id.* at 261-65. Additionally, he admitted there were periods of time where Mother would not speak to him, and that he did not live in Philadelphia. *Id.* at 267-71.

Yolanda West testified that she is Mother's outpatient therapist. *See* N.T., 11/30/18, at 276. At the time of the hearing, she had been meeting with Mother since approximately December 2017, initially every week and then biweekly. *Id.* at 277-78.

Much of the therapy centered around the sexual assault of J.U. by Mother's husband. *Id.* at 279-80. Mother admitted to West that she was still speaking to D.G. because she was trying to "get him to admit what he [had done to J.U.]," or to obtain proof and help with "having put him away." *Id.* at 281. Mother accepted responsibility for handling the situation in the wrong way, but, since then, there has been no contact. *Id.* West testified that, based on the work she had done with Mother, Mother's mental stability had increased, Mother had setbacks she had worked through, and Mother met all of her compliances. *Id.* at 289.

West saw no reason Mother could not return to being an efficient parent, and believed Mother could provide stability and permanency for Children, and that Mother had gained insight into the issues that brought Children into care. *Id.* at 289. West stated that, although Mother had been repeatedly found in contempt for violation of court orders, these violations were related to "just wanting to see her kids." *Id.* at 298-300.

Mother testified that she was married to D.G. and he was living in her home at the time he assaulted J.U. *See* N.T., 1/18/19, at 12-15. Mother claimed that she visited D.G. while he was in custody, but only so she could prove his plea of innocence was false. *Id.* at 16. Although D.G. did not confess to her in person, Mother stated that he confessed in a letter that she gave to detectives. *Id.* at 17-19. Mother claimed that J.U. begged not to be brought to court. *Id.* at 28. Mother stated that during the court case she was there to support J.U., not D.G., and that she divorced D.G. as soon as she was able to afford it. *Id.* at 32-33.

Mother testified that she has lupus and suffered several strokes as a result of that condition. However, her medical conditions have never prevented her from caring for Children. *Id.* at 36-37.

Mother testified that she attended therapy for a year and a month and that she was discharged because she had met her goals. *Id.* at 38-40. During her therapy sessions she worked on issues surrounding domestic violence and her depression. *Id.* at 40-41. Mother testified that she knew her noncompliance with court orders was wrong and that she had "messed up,"

and that the non-compliance negatively affected her children. *Id.* at 41-42. When asked to describe her bond with Children, Mother testified that she loves them very much. *Id.* at 44-45.

On cross-examination, DHS introduced bench warrants issued when Mother failed to appear with J.U. at her court hearings, and text messages sent by Mother to J.U. and Children asking them to be dramatic, crying, and begging. *Id.* at 55-58. Mother admitted to being held in contempt several times and having continuing contact with D.G. while he was incarcerated. *Id.* at 59-60. Mother admitted that she never filed a victim impact statement on J.U.'s behalf. *Id.*

Yalonda Houston, Esquire, Children's child advocate, placed Children's preferences on the record. *See* N.T., 1/18/19, at 81-82. A.R.U., who was five years old, did not respond when asked if he understood adoption. *Id.* at 81. However, when asked if he would like his home with K.J. to be his forever home, A.R.U. responded "yes," then ran away and began playing with the other children. *Id.* at 81. When asked if he would like his home with K.J. to be his forever home, S.C.U. responded that he would love to return to his mother but that it was the judge's decision and, if adoption was the decision, S.C.U. would like to remain with his current caregiver. *Id.* at 82.

At the conclusion of the hearing, the trial court granted the petitions and terminated Mother's rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Children's permanency goal to adoption. Mother timely

filed notices of appeal and statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of Mother pursuant to [23 Pa.C.S. § 2511(a)(1)] without clear and convincing evidence of mother's intent to relinquish her parental claim or refusal to perform her parental duties[?]

2. Whether the trial court erred by terminating the parental rights of Mother pursuant to [23 Pa.C.S. § 2511(a)(2)] without clear and convincing evidence of mother's present incapacity to perform parental duties[?]

3. Whether the trial court erred by terminating the parental rights of Mother pursuant to [23 Pa.C.S. § 2511(a)(5)] without clear and convincing evidence to prove that reasonable efforts were made by Department of Human Services to provide [M]other with additional services and that the conditions that led to placement of the children continue to exist[?]

4. Whether the trial court erred by terminating the parental rights of Mother pursuant to [23 Pa.C.S. § 2511(a)(8)] without clear and convincing evidence that the conditions that led to placement of the children continue to exist when Mother presented evidence of compliance with the goals and objectives of her family service plan and parenting capacity evaluation[?]

5. Whether the trial court erred by terminating the parental rights of Mother pursuant to [23 Pa.C.S. § 2511(b)] without clear and convincing evidence that there is no parental bond between mother and children and that termination would serve the best interest of the children[?]

***See*** Mother's Brief at 7.

We review cases involving the termination of parental rights according to the following standards.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). To affirm, we need only agree with any one of the subsections of 2511(a), as well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we focus our analysis on subsection (a)(2) and (b).

The relevant sections of 23 Pa.C.S. § 2511 provide that:

**(a)** **General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

Essentially, Mother argues that the evidence does not support termination under this section because she has remedied the conditions causing the incapacity. *See* Mother's Brief at 12. Specifically, Mother contends that she cooperated with the District Attorney by obtaining a written confession from D.G., developed insight to identify situations and relationships that could pose a threat to Children's safety, and pointed to expansive family support from her father, T.C., and extended family. *Id.*

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be

without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **See In Interest of Lilley**, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but include any parental incapacity that cannot be remedied. **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. **Id.**

The court made the following findings:

I am going to address the credible facts in this case beginning with the fact that for 29 months these [C]hildren have been in care and away from the [M]other. Mother throughout the history of this case has been contemptuous, has failed to follow court orders, has tried to influence the outcome of a criminal case in which her daughter was a victim of a rape. I'm making that finding.

Additionally, I'm finding that Dr. Russell's November 30, 2018 testimony regarding [M]other's parenting capacity is credible. He testified that [M]other couldn't provide safety or permanency for these [C]hildren, that she made bad decisions as a result of her childish behavior and her immaturity, that she has a severe lack of decision making and a pattern of bad decisions which are quite obvious in her interactions with this [c]ourt and her contemptuous behavior.

He said: "She put on blinders[,"] meaning she lacked insight on how to care for these [C]hildren. And he based that on her shielding this child from testifying in the criminal case regarding her husband, [D.G.], and found that kind of decision-making was impaired. As to her ability to parent[,] he found that she was not being honest when he interviewed her[,] and that she could not provide safety for these [C]hildren.

Additionally, we heard about the bond that the children have with their caretaker in this case. Also[,] I heard from Mr. McKnight, the worker, who went on to testify that – onto various violations of the court order which he personally observed. Particularly

- 16 -

unauthorized conduct, physical conduct, between [M]other and [J.U.] in a supermarket which he observed and followed them, phones that were confiscated from the [C]hildren in violation of court orders. And also[,] we heard from the detective from SVU.

Additionally, throughout the history of this case, numerous hearings, we heard from Ms. Walker, the visitation coach, who testified that one of the [C]hildren, [A.R.U.], doesn't have interaction with [M]other during visits and[,] in her opinion[,] has no parental bond. Mother has no parental bond with that child.

Mother's witnesses included her father, [T.C.], who testified that there were 15 to 16 family members ready to care for the [C]hildren. I did find [T.C.'s] testimony to be credible. However, [M]other never gave [T.C.] any phone number for the DHS worker or the CUA worker so he could follow up and explain to them that he had some potential caregivers for these [C]hildren which the [c]ourt was unaware of. And additionally, he hadn't seen the children in over two years.

And today we heard from the [M]other regarding her attempts to file a victim impact statement on behalf of [J.U.] in the criminal matter where a child was raped. However, there was never any impact statement given by [M]other[,] despite invitations from the D.A.'s office[,] which the [c]ourt saw proof of through the introduction of [M]other's documents and emails with the D.A.'s office and also subpoenas.

Mother's cooperation, if any, with the District Attorney's office, which [led] to the guilty plea by [D.G.] to raping her daughter, was minimal at best and way after the fact. She in fact kept her child away intentionally from two preliminary hearings in this case and[,] I believe[,] was held in contempt by the criminal court. In addition, this [c]ourt on numerous occasions found her in contempt for violating court orders with regards to staying away from the children and any phone, text messaging or any form of contact[,] which she repeatedly violated.

So the [c]ourt is left with the inescapable conclusion that the best interest of these children dictates that Mother's rights be terminated under 2511(a)(1), (2), (5), and (8) and 2511(b). I make this finding in the best interest of the [C]hildren after taking into consideration the character and fitness of the parties involved.

In other words, [M]other's character and the foster parents' character. And also the parental duties being performed for the past 23 months by each of the parties on behalf of the [C]hildren. And exclusively those parental duties have been performed by the foster parents.

Additionally, the need for stability and continuity and the children's education, family life and community life[,] and also I'm taking into account the preference of the children based on their maturity and judgment. In this [A.R.U.], the five[-]year[-]old, didn't understand the concept of adoption. However, the [C]hild did understand that, when asked by Ms. Houston, where the [C]hild preferred to live in particular would this foster home be a forever home for the [C]hild and the [C]hild indicated yes[,] that the [C]hild wanted the foster care to be the forever home.

With regard to [S.C.U.], the ten – or 11[-]year[-]old, the testimony was that the child would love to return to [M]other. However, the child left it up to the [c]ourt as to whether or not [C]hild would stay in foster care. And I'm finding that in the best interest of [S.C.U.], who is living with both the five[-]year[-]old, [A.R.U.], and another brother, [H.U.], in the foster home[,] that it is in their best interest to remain in that foster home because it is more likely the foster parents will maintain a loving, stable, consistent and nurturing relationship for the children.

And given the fact that the foster parents are providing for the daily needs of these children and [M]other's continued contemptuous behavior with regard to court orders, I have no assurances that she would follow any dictates of the[c]ourt in the future because she has not followed any in the past other than completing some parenting and some mental health treatment. So for those reasons [M]other's rights are terminated. The goal for these children is adoption.

*See* N.T., 1/18/19, at 91-96.

This reasoning is supported by the record. Rather than completing her goals and complying with court orders, evidence was introduced to show that Mother was likely still refusing to comply with court orders, and she had not

identified a support system to DHS prior to the termination hearing. Additionally, her parenting capacity evaluation and Dr. Russell's testimony showed that Mother was not capable of providing stability and permanency to Children at that time, nor should she have unsupervised visitation with Children.

Accordingly, we conclude that the trial court properly found by clear and convincing evidence that Mother's parental rights to Children could be terminated pursuant to Section 2511(a)(2), based upon the finding that Mother evinced a continued incapacity – an inability to ensure that she would keep Children safe and remain compliant with her objectives – that resulted in Children being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Next, we must consider whether Children's needs and welfare will be met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have noted:

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort,

security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

***Z.P.***, 994 A.2d at 1121 (quoting ***In re C.S.***, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. ***See In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. ***In re: K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008).

Mother argues that the court erred in terminating her parental rights because she and her [children] have a strong emotional bond, and she was their exclusive caregiver during the formative years of their lives. ***See*** Mother's Brief at 14. She contends that her ability to strengthen this bond was destroyed by the suspension of visitation with her children and that she was not a grave threat to children.[3] ***Id.***

---

[3] Initially, we note that Mother has previously litigated the issue of her visitation and whether she was a grave threat to Children. This Court affirmed the trial court's order finding that Mother had moral deficiencies that posed a grave threat to children which justified a temporary suspension of visitation. ***See A.U.***, 170 A.3d at 1199 (Pa. Super. 2017). Mother did not appeal this decision to the Pennsylvania Supreme Court.

Evidence was presented to show that A.R.U. does not have a bond with Mother. During visitations, A.R.U. prefers to play with toys and gifts rather than interacting with Mother. In the opinion of caseworker McKnight and visitation coach Walker, A.R.U. is not bonded with Mother. Attorney Houston, A.R.U.'s legal counsel, stated that A.R.U. preferred for his foster father and home to become his "forever home."  Mother testified that she loves A.R.U. However, this Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **_L.M._**, 923 A.2d at 512.

With regard to S.C.U., there is some evidence that there is a bond with Mother. However, Walker testified that he also prefers to play with toys rather than interact with Mother during visitation, which indicates a lack of a bond. Further, McKnight testified that in his opinion the bond Mother shares with S.C.U. is not a healthy one. On the other hand, Attorney Houston, S.C.U.'s legal counsel, stated that S.C.U. loved Mother and would like to remain with her, indicating some evidence of a bond. But this testimony was tempered by Attorney Houston's observation that S.C.U. was equally happy to remain in the care of his foster family.

Additionally, even beyond any bond with Mother, Children's best interests are served by the permanency, stability, and safety provided by their relationship with their foster father. Testimony was presented to show that Mother did not have the capacity to safely parent Children. Additional

testimony was presented to show that Children have a strong bond with their foster father, who provides for their needs.

On this record, indicating that there is either no bond or an unhealthy bond between Mother and Children, clear and convincing evidence supports the trial court's termination of Mother's parental rights with respect to 2511(b), where adoption would best serve Children's needs and welfare. ***See Z.P.***, 994 A.2d at 1126-27; ***K.Z.S.***, 946 A.2d at 763.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/19